Date signed September 30, 2008



**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| In re: | * | |
| LEON R. LEVITSKY, | * | Case No.: 04-16203-JS |
| Debtor | * | Chapter 7 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

| | | |
|---|---|---|
| LORI S. SIMPSON, CHAPTER 7 TRUSTEE, | * | |
| | * | |
| Plaintiff | * | |
| v. | * | Adv. Proc. No. 04-2024 |
| LEON R. LEVITSKY and JANE LAMBERT | * | |
| | * | |
| Defendants | * | |

\*   \*   \*   \*   \*   \*   \*   \*

| | |
|---|---|
| MANUFACTURERS AND TRADERS TRUST COMPANY, | * |
| | * |
| Plaintiff | * |

v.                              *        Adv. Proc. No. 05-1254

LEON R. LEVITSKY, Et al.          *        (Consolidated into 05-1254)

            Defendants             *

*    *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM OPINION GRANTING CHAPTER 7 TRUSTEE'S COMPLAINT FOR TURNOVER OF PROPERTY OF THE ESTATE, UPHOLDING LIEN OF CIT GROUP CONSUMER FINANCE, INC., AND AVOIDING LIEN OF MANUFACTURERS AND TRADERS TRUST COMPANY AS TO THE SAID PROPERTY

Before the Court are two adversary proceedings that relate to the debtor's residence ("the Property"). The first, Adversary Proceeding No. 04-2024, brought by Lori S. Simpson, the Chapter 7 Trustee, asks the Court to declare that the Property is includable as property of the debtor's estate, even though it is titled in the name of a corporation, and to grant other relief. The second, Adversary Proceeding No. 05-1254, brought by Manufacturers and Traders Trust Company ("M&T"), seeks a declaratory judgment against CIT Group Consumer Finance, Inc. ("CIT") as to the priority of recorded liens on the Property. In that proceeding, the parties have filed cross-claims and counterclaims.[1] The Court having issued an order setting the order of proof, trial was held on the Trustee's complaint, at the conclusion of which this Court held that the debtor's residence was property of the estate. The Trustee then

---

[1]On May 19, 2005, these adversary proceedings were consolidated by consent order [P. 22]. Thereafter, all pleadings were filed in Adversary Proceeding No. 05-1254.

presented her case in the second adversary proceeding to establish the invalidity of the liens of both CIT and M&T.  At the close of the Trustee's case, CIT and M&T filed the instant motions for judgment.  Counsel for CIT informed the Court that were its motion to be denied, it would put forward its own case, while counsel for M&T stated that it had no further case to put forward.  For the reasons set forth, the motion for judgment filed by CIT will be granted, that of M&T will be denied, and the lien of M&T will be avoided.

**THE PARTIES**

1.  Leon R. Levitsky ("Levitsky," or "the debtor") is a resident of the State of Maryland.

2.  Jane A. Lambert ("Jane") is the debtor's wife.

3.  Lori S. Simpson ("Trustee") is the debtor's Chapter 7 Trustee.

4.  Contemporary Magic Kingdom, Inc., t/a CMK Company ("Contemporary"), is a corporation organized under the laws of the State of Maryland by Levitsky, and holds record title to the Property.

5.  Associated Enterprises Ltd. is a defunct corporation organized by Levitsky under the laws of Great Britain on the Isle of Man.  When a subpoena was sent to Associated in this action, it was returned two months later with a sticker that stated simply, "Gone Away."

6.  JP Morgan Chase Bank, N.A. ("JP Morgan") is a corporation organized under the laws of the United States and was a holder of a deed of trust on the Property.

7.  Manufacturers and Traders Trust Company ("M&T"), is a commercial bank chartered under the laws of the State of New York, registered and qualified to do business in the State of Maryland, and claims to hold a first lien on the Property.

8.  CIT Group Consumer Finance, Inc. ("CIT") was assigned the deed of trust from JP Morgan and claims to hold a lien on the Property.

9.  The Internal Revenue Service ("IRS") asserts a secured claim against the debtor in the amount of $462,190.85, a priority claim in the amount of $10,252.78, and an unsecured claim in the amount of $347,890.76, for a total claim in the amount of $820,334.39.  Claim No. 50.

*FINDINGS OF FACT*

1.  The debtor has been in continuous possession of the Property from September 1983 to the present.  It is his personal residence, a waterfront property identified as Lots E and F in the subdivision known as "Arundel on the Bay," located at 1315 Magnolia Avenue, Annapolis, Maryland 21403.  In a 2001 financial statement, the debtor valued the Property and its contents at $1 million.  Trustee's Exhibit 4.  The Trustee's investigation disclosed that the Property is titled in the name of CMK Company, Inc., a purported trade name of Contemporary.  The debtor's

4

ownership of Contemporary was not disclosed in either his Schedule A or B (listing, respectively, real and personal property). However, CMK, Inc. was listed as an unsecured non-priority creditor in Schedule F, and as a party to an executory contract with the debtor in Schedule G. Bankruptcy Schedules, Trustee's Exhibit No. 20.

2. On March 2, 1982, Levitsky separated from his first wife, Carol Leigh Levitsky ("Carol"), left their marital home and moved into an apartment with Jane.[2]

3. In April 1982, one month after he separated from Carol, Levitsky purchased the Property and titled it in the trade name of Contemporary, the corporation he created in order to put the house that he purchased for himself and Jane beyond the reach of creditors, particularly Carol.[3]

4. Evidence of Levitsky's motivation to shield the home from Carol manifested itself in the following actions taken by the debtor.[4]

_____

[2]Carol and Levitsky were not divorced until May 31, 2000. Divorce decree of the Circuit Court for Anne Arundel County, Maryland, dated May 31, 2000, Trustee's Exhibit No. 152. Levitsky and Jane were married on June 2, 2000. Deposition of Jane Lambert, July 19, 2006, at 7.

[3]Levitsky testified that the corporate name was based on his romantic ideal that the Property would serve as the perfect residence for him to enjoy his "magical relationship" with Jane. Tr. at 62:11, where Levitsky agrees with Trustee's opening statement at 10:16.

[4]Carol filed a secured claim [Claim No. 11] in the amount of $641,795.90, representing the net judgment against Levitsky entered by the Circuit Court for Anne Arundel County in her divorce proceeding, and a priority claim [Claim No. 12] for unpaid support obligations in the amount of $10,363.65. In a separate adversary

A.  The timing of the purchase of the Property in 1983 occurred shortly after the separation from Carol.

B.  His relationship with Jane created the potential for a financially unfavorable divorce.

C.  A handwritten notation in a letter written by James K. Stitcher, the debtor's accountant (now deceased), with additional notations made by the debtor in his own handwriting, indicated that Levitsky set up Contemporary "[i]n order to  get [the home] out of his wives (sic) grasp."  Memo from James Stitcher, Trustee's Exhibit No. 61.[5]

_____

proceeding, Adv. Proc. 04-02395, this Court found part of her claim to be non-dischargeable, when Levitsky sold their interest in real property owned by their Prince George's Doctor's Hospital Joint Venture without reimbursing her.

[5]The following is the complete text of the memorandum:

RE:  Dr. Levitsky Condemnation Replacement

Since our last discussion regarding your [illegible] of the use of the Magnolia Avenue property, as the replacement property, due to the fact the property was put into a corporation which did not exist at the time of the condemnation, certain additional facts have emerged as a result of my recent discussion with Dr. Levitsky.  They are as follows:

1.  The Magnolia property was acquired from Mr. Benbasset in 1983 and owned by him as an individual until he subsequently transferred it to the corporation.

2.  The sale was financed by a down payment of $37,500.00 plus

made by Dr. Levitsky and a personal loan made by Dr. Levitsky from Maryland National Bank.

3.  Shortly after purchasing the property, a contractor was hired to perform renovations to the property.

4.  The deed was not recorded at that time due to the fact that permanent financing had not been obtained and there was no sense of to record since the parties maintained an on-going business and personal relationship existent to this day.

5.  We are providing you with signed letters from Mr. Benbasset and Mr. Cailuette attesting to aforementioned.

6.  Dr. Levitsky was engaged in a divorce action during 1983 and wished protect his property rights relative to this property.  In order to do so, when he obtained permanent financing on the property he decided to put the property into a corporation in order to get it out of his wives [sic] grasp.

7.  The corporation in this issue, had no cash, therefore the down payment had to have been made by Dr. Levitsky.  The sales price was $167,500.  But the permanent financing was for $130.00. Furthermore, the corporation would not have been sufficiently credit-worthy to obtain this loan on its own.

8.  Additionally the improvements were contracted for and paid for by Dr. Levitsky and almost completed by the time the deed was.

As a result of the foregoing, our position is that Dr. Levitsky in fact owned the property prior to its transfer to a corporation.  He wholly owned and paid for this property.  This property qualifies as replacement property in the matter under consideration.

Should you continue to disagree with this position, write this case up as disagreed and we shall proceed to amend our 1981 tax court

7

D.  Levitsky had no explanation for his decision to place the ownership of his residence in a corporate name.

E.  The Property was the sole asset of Contemporary.

5.  Levitsky has resided in the Property for nearly 25 years but paid no rent to the corporation, except for the one payment of approximately $36,000, that he paid shortly before the petition date, which he denominated as "arrears."[6]  Despite being so far in arrears, Contemporary never sought to evict Levitsky.  Trial Transcript ("Tr.") at 193.

6.  A $3,610 figure recorded as "rent" on the books of the corporation was actually money lent to Contemporary by Maryland National Bank ("MNB").

7.  The only written leases on the Property between Levitsky and Contemporary that were entered into evidence, purportedly executed in 1983, were crude forgeries that contained a telltale 2006 facsimile date with the debtor's signature written in ink.  Facsimile copy of lease, Trustee's Exhibit No. 147.

8.  For many years, the corporation had only $5 in its bank account.

---

proceedings to include this issue.  This matter has been discussed with legal council [sic] and they believe our position has merit.

*Id.*

[6]The Trustee sued Contemporary in a separate adversary proceeding, Adv. Proc. 06-01285, in order to recover fraudulent conveyances.

8

9. Levitsky paid all expenses accruing from the ownership of the Property from his personal checking account or from the operating accounts of his personal secretaries. These payments included real estate taxes and homeowner's insurance, as well as corporate expenses, such as SDAT filing fees and accounting expenses. Travelers invoices and checks, Trustee's Exhibit No. 27; 2003 tax bill for Property, and checks paying taxes, Trustee's Exhibit No. 28; and checks paying water bills for Property, Trustee's Exhibit No. 29.[7]

10. Levitsky obtained homeowner's insurance, listing himself as the beneficiary and personally received payment of claims for damage to the Property. Hartford Homeowner's Policy, Trustee's Exhibit No. 17; Travelers Homeowners Insurance Policy, Trustee's Exhibit No. 18; Correspondence/documentation regarding flood damage to Property, Trustee's Exhibit No. 19; and Chubb Homeowner's Insurance Policy, Trustee's Exhibit No. 21.

11. On Schedule B (Personal Property) filed with his bankruptcy petition, Levitsky scheduled a $140,000 insurance claim for storm damage to the Property resulting from Hurricane Isabel.

---

[7]Levitsky routinely commingled funds between himself and Contemporary. Post-petition, Levitsky opened a checking account in the name of Contemporary but used it to pay personal expenses. One check, No. 1032, was written by Contemporary to Levitsky but payable to the order of "Me." Tr. at 402.

9

12.  On his personal income tax returns, Levitsky deducted interest payments paid on the mortgage on the Property.

13.  Levitsky stopped filing tax returns for Contemporary after his divorce from Carol became final.

14.  Despite the fact that the Property was titled in the name of the corporation, Levitsky claimed the Property as tax exempt when he filed for a state homestead property tax exemption that was available only to individual homeowners.  Trustee's Exhibit No. 12.

15.  During an audit by the IRS, Levitsky defended his non-payment of capital gains taxes resulting from the sale of different piece of real property, on the ground that he had used monies from that sale to purchase the Property, even though the defense was available only to an individual purchaser.  Trustee's Exhibit No. 64.

16.  In his Last Will and Testament, Levitsky devised to Jane "any interest which I may possess at the time of my death in [the Property]," thereby treating it as his own. Article V. B., Last Will and Testament dated October, 1994, Trustee's Exhibit No. 3.

17. Levitsky was the sole shareholder[8] and sole director of Contemporary. Although he originally disputed at depositions that he was also president of the corporation, Levitsky suddenly remembered at trial that he was.  Tr. at 130:5.

18.  There are no other current officers or directors of Contemporary, although the corporate bylaws required that there be four officers, namely a president, vice president, secretary and treasurer, and that the president and secretary could not be the same person.  M&T Exhibit No. 14.[9]

19.  Contemporary never had any employees or conducted any business.[10]

---

[8]At various times during his trial, Levitsky testified that there were other shareholders of Contemporary, including his son, Jeffrey Levitsky and someone named Britt Day. This was inconsistent with his prior deposition testimony.  Levitsky offered no proof, other than his own testimony, of the existence of these other shareholders. Contemporary kept no stock register.   The evidence offered by the Trustee established that Levitsky was the sole shareholder of Contemporary.  Tr. at 152-59.

[9]At one time, Helen DeWire was listed as secretary.  Before her death, she was Levitsky's secretary at his medical offices.

[10]Levitsky testified that Contemporary was engaged in the fishing and shrimping industry, but was unable to produce any evidence other than his own self-serving testimony that he had imported fish and shrimp from a warehouse in Mexico for several years until the warehouse was destroyed by fire.  Tr. at 211:20 *et. seq.*, see also Levitsky's opening statement at Tr. at 54:3 *et seq*.  Despite many opportunities to provide such information at depositions, Levitsky never mentioned any involvement of Contemporary in the fishing and shrimping industries until his debut on the witness stand at trial.  However, he listed a shrimp packing plant worth $500,000 among his personal assets in a 1992 loan application.  Uniform Residential Loan Application dated October 9, 1992, Statement of Assets, Liabilities and Net Worth as of January 10, 1992, Trustee's Exhibit No. 6.

11

20.  On May 25, 1982, Levitsky registered the trade name "CMK Company" in the Circuit Court for Prince George's County, Maryland, identifying himself as president of Contemporary.  SDAT Certified copy of Tradename Designation for registration of trade name CMK Company by Contemporary Magic Kingdom, Inc. dated May 25, 1982 and received by the Maryland State Department of Assessments and Taxation ("SDAT") on July 19, 1982 or 1983,  M&T Exhibit No. 19.

21.  Levitsky engaged an attorney (now deceased) named Paul M. Nussbaum ("Nussbaum"),[11] who incorporated an entity entitled Title Nominee, Inc. ("Title Nominee"), of which Nussbaum was president, for the sole purpose of purchasing the Property, in order to assign the contract of sale to a different entity chosen by Levitsky.  The contract between the sellers and Title Nominee was dated August 25, 1983.  Nussbaum file, Trustee's Exhibit No. 93, pp. K094-96.

22.  Title Nominee assigned the sale contract to "CMK Company, a Maryland Corporation."

23.  On September 7, 1983, CMK took title to the Property by deed from Roseanne Druian and the Magnolia Way Joint Venture for consideration of $167,500.

_____

[11]Not to be confused with a Maryland attorney of the same name currently practicing law in Baltimore.

Deed dated September 7, 1983, recorded among the Land Records of Anne Arundel County at Liber No. 3642, folio 666, Trustee's Exhibit No. 1-A.

24.  In order to purchase the property, Levitsky arranged for the payment of a $50,000 deposit from L Enterprises, another of his corporations.  He also arranged to obtain a loan from MNB to Contemporary in the amount of $130,000.  On the promissory note from Contemporary to MNB, Levitsky wrote, "I'm a one man corporation."  Corporate certificate of authority to borrow, dated September 17, 1983, Trustee's Exhibit No. 93, K045.  He simultaneously executed a deed of trust from CMK Company, which he signed as president.  Purchase Money Deed of Trust dated September 30, 1983, recorded among the Land Records of Anne Arundel County at Liber No. 3642, folio 668, Trustee's Exhibit No. 1B.  Levitsky personally guaranteed the loan.  The sum of $3,610 remained after closing costs and was entered on the books of Contemporary as rent from Levitsky, despite the fact that the figure represented the residue of the loan from MNB to Contemporary.

25.  Levitsky and Jane resided together in the Property until their separation in 2002.

26.  On September 29, 1983, Levitsky filed "CMK Company" as a trade name in the Circuit Court for Anne Arundel County, Maryland.[12]  M&T Exhibit No. 20.

27. Between October 3, 1991 and February 19, 2004, the corporate charter of Contemporary was in forfeiture status with the SDAT.  Trustee's Exhibit No. 108.

28.  On October 28, 1997, Tega Cay Properties, LLC ("Tega Cay") sued Levitsky in the Court of Common Pleas for York County, South Carolina, styled *Tega Cay Properties, LLC, et al. v. Levitsky, et al.*, Case No. 97-CP-46-1974.  The complaint alleged that Levitsky was a minority investor and an active manager of Tega Cay; that he improperly filed a Chapter 7 bankruptcy petition in the District of Maryland in 1995, purportedly on behalf of Tega Cay; and that this Court (Mannes, C.J.) dismissed the petition as having been filed in bad faith and sanctioned Levitsky because he had filed the petition for the improper purpose of delaying a corporate shareholders meeting.

---

[12]Levitsky testified that he preferred to use various permutations of the name "CMK" when conducting transactions because it sounded more professional than Contemporary Magic Kingdom.  The Trustee has contended that Levitsky actually used the various permutations (including "CMK, Inc.," "CMK Company, Inc.," "CMK," and "CMK1") in order to confuse creditors.  In order to avoid confusion, in referring to the corporate entity created by Levitsky, this opinion will employ the term "Contemporary" in place of the full corporate moniker of "Contemporary Magic Kingdom, Inc.".

14

29.  On March 18, 1998, Contemporary obtained a loan in the amount of $450,000 from Associated, an entity incorporated by Levitsky on the Isle of Man, and not licensed to do business in the State of Maryland.

30.  The evidence indicated that Levitsky controlled Associated.  He had previously formed an offshore trust called the Meridian Management Trust ("Meridian"), and then had Meridian form a corporation known as the Mendoza Corporation ("Mendoza") on the island of Nevis.  Levitsky then transferred approximately $680,000 worth of Crestar stock to Mendoza, which Mendoza sold without tax consequences and invested the proceeds to fund a tax-free annuity payable to himself.  Mendoza also lent some of the proceeds to Levitsky through Associated, an affiliate of Meridian.  Funds held by Mendoza in the amount of $450,000 were in fact disbursed through Associated pursuant to a loan agreement whereby Contemporary was the supposed borrower.[13]

## LIENS ON THE PROPERTY

31.  On September 16, 1998, First National Bank of Maryland ("FNB") made a $100,000 loan to CMK Company, Inc., in exchange for a promissory note for the

---

[13]Approximately $157,000 of the $450,000 "borrowed" from Associated was used by Levitsky to pay off the loan from MNB.  He cannot account for the $300,000 amount remaining from the transaction. James Stitcher, the debtor's accountant, reported to the IRS that the figure was loaned to Levitsky.  There is no evidence that Levitsky ever repaid it.

same amount.   The note was signed, "LEON R. LEVITSKY, SIGNING AS PRESIDENT CMK COMPANY, INC.".  FNB recorded its mortgage among the Land Records of Anne Arundel County, Maryland in Liber 8713, folio 551.  Trustee's Exhibit 1L.  FNB later sold the note to M&T.

32.  In 2001, Jane decided to build a dance studio, and Levitsky agreed to pay for it with a loan based on the equity in the Property, which had greatly increased in value.  However, he was unable to obtain credit using his own name because of the pending lawsuit brought by Tega Cay.  Accordingly, he arranged a more complicated financing transaction.  On May 21, 2001, Bank One, N.A. ("Bank One"), made a loan in the amount of $680,000 to Jane, who delivered a promissory note for the same to Bank One and also signed a deed of trust.  Simultaneously, Contemporary executed and delivered to Jane a deed to the Property for no consideration.  The deed was signed by "Leon Levitsky, President CMK Company."  Trustee's Exhibit 1Q.

33.  Bank One was later acquired by JP Morgan Chase Bank, N.A., one of the parties to this action, which assigned the deed of trust to CIT.

34.  Bank One engaged Mark Reges ("Reges") and Central Processing Services, LLC ("CPC") to conduct the settlement.

35.  Reges and CPC erred in the recording of Bank One's deed of trust.  They mistakenly treated the Bank One deed of trust with Jane as one for the refinance of the

16

Property, rather than as a purchase money deed of trust. While transfer taxes are required to be paid on a purchase money deed of trust, they need not be paid on an interspousal refinancing deed of trust. Accordingly, Reges and CPC did not verify that appropriate transfer taxes were paid. However, because Jane was married to Levitsky rather than to Contemporary, there was no interspousal exemption. Accordingly, the Clerk of the Circuit Court for Anne Arundel County declined to accept the deed for recording.

36.  A second error committed by Reges and CPC involved the coordination of the payout of prior lenders, the loans to which were secured by the Property. The settlement sheet from the May 21, 2001 settlement indicated that $146,299.49 was disbursed to First Liberty National Bank, $458,470.90 was disbursed to Associated, and $50,334.79 was disbursed to Jane for the purpose of starting a dance studio. The disposition of funds supposedly disbursed to Associated is unknown. It is undisputed that FNB received no disbursement. Reges relied on an abstractor's summary that identified Levitsky by mistake as the secured party, rather than FNB.

17

37.  Accordingly, as part of the settlement transactions, Levitsky signed a certificate of satisfaction of the FNB loan and either Reges or Levitsky recorded in the land records the certificate that stated that the loan from FNB had been satisfied.[14]

38.  It is undisputed that the certificate was incorrect in describing Levitsky as the holder[15] of the deed of trust.

---

[14]The certificate of satisfaction, recorded in Liber 0434, folio 368 of the Land Records of Anne Arundel County, stated as follows:

> That Leon R. Levitsky does hereby acknowledge that the indebtedness secured by a certain Deed of Trust/Mortgage made by CMK Company and recorded among the Land Records of Anne Arundel County, Maryland in Liber 8713, Folio 551, which encumbers the real property described in Exhibit A hereto, has been fully paid and discharged, that Leon R. Levitsky was, at the time of satisfaction, the holder of the Deed of Trust Note/Mortgage, and that the lien of the Deed of Trust/Mortgage is hereby released....

*Id.*  It was signed by Levitsky.  Trustee's Exhibit 1N.  Beneath his signature was a notarization executed by Jonathan S. Bach, a CPC employee.  Under the notary seal appeared the following statement, signed by Reges:  "THIS IS TO CERTIFY that the within instrument was prepared by or under the supervision of the undersigned, an Attorney duly admitted to practice before the Court of Appeals of Maryland."

[15]"Holder" is defined in the Maryland Commercial Code as "(a) The person in possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession; (b) The person in possession of a negotiable tangible document of title if the goods are deliverable either to bearer or to the order of the person in possession; or (c) The person in control of a negotiable electronic document of title."  Md. Comm. Law Code Ann. § 1-201(20).  The deed of trust is a negotiable instrument; however, because it was not payable to bearer or to Levitsky, he did not qualify as a holder under the law.

18

39. By 2002, Levitsky and Jane had separated. At the time of this opinion, they have not obtained a final decree of divorce.

40. On August 2, 2002, as part of a marital property settlement between Levitsky and Jane, Jane conveyed her interest in the Property back to Contemporary by quitclaim deed. Trustee's Exhibit No. 139, Quitclaim Deed Exhibit 2 to Jane Lambert Deposition.

41. By the time Reges and CPC discovered that the Bank One deed of trust had not been properly recorded, they had lost the original deed of trust. Consequently, CPC obtained a replacement deed from Contemporary to Jane, and a replacement deed of trust from Jane to Bank One.

42. Levitsky refused to pay the transfer taxes, and pressured by Bank One to have the deed recorded, Reges paid the transfer taxes out of his own pocket. The replacement deed and replacement deed of trust were recorded among the Land Records of Anne Arundel County, Maryland on December 17, 2002 at Liber No. 12273, folios 773 and 776, respectively. However, by that date, Jane had already deeded the Property back to Contemporary, although that deed was not then recorded.

43. On June 13, 2003, the Court of Common Pleas in South Carolina (Nicholson, J.) ruled against Levitsky in the Tega Cay litigation and awarded the plaintiff $6.7 million in compensatory damages and $3.3 million in punitive

damages.[16]  (On April 28, 2005, by order [P. 38] entered in *Tega Cay Properties, LLC*

---

[16]In a 35-page final order, Judge Nicholson stated:

. . . I find and conclude as follows: (1) Dr. Levitsky's deliberate and unrepentant fraud, fraudulent concealment and breach of his fiduciary duties, which the plaintiffs demonstrated time and time again through the course of trial, leave no doubt that Dr. Levitsky's actions were intentional and malicious, for which he is fully culpable. (2) Dr. Levitsky's conduct was not an isolated incident, but a continuous pattern of fraud and deceit over a period of at least seven years. (3) There can be no doubt from the almost incredible efforts expended by Dr. Levitsky in concealing his fraud that he was fully aware of his acts and they were fully intentional. (4) The continuing pattern of fraudulent behavior and breach of fiduciary duty with Dr. Levitsky bespeaks, at last to the plaintiff, that Dr. Levitsky['s] past conduct was similarly egregious. Dr. Levitsky's attempt to engage the mayor in fraudulent kickback scheme serves as a prime example. (5) Dr. Levitsky's continuous disrespect for the courts of this state and other states, coupled with his abuse of the discovery process in this proceeding has demonstrated that a firm and significant award of punitive damages is necessary to deter future similar conduct. (6) The malfeasance of Dr. Levitsky caused actual damages in excess of $6 million to the plaintiff, even when conservatively calculated. Dr. Levitsky's fraud and breach of his fiduciary duties are clearly related to the actual harm which was caused by Dr. Levitsky's malfeasance. (7) Dr. Levitsky has deliberately concealed and obfuscated his net worth from this Court. Therefore, the Court cannot precisely determine his net worth and ability to pay. Since Dr. Levitsky has been the cause of this information not being available, it is appropriate not to consider this factor. *Wilhoit v. WCSC, Inc*., 298 S.C. 34; 358 S.E.2d 397 (Ct. App. 1987). However, the Court notes that the financial information which has been submitted shows that Dr. Levitsky has substantial income from investments and holds substantial property, so that the Court can fairly conclude that his net worth is at least $5 to $7 million dollars. (9) Finally the Court cannot overemphasize that Dr. Levitsky has continuously thumbed his nose at the judicial process, not only in this Court, but in several other state and federal courts. There needs to be an

*v. Leon R. Levitsky*, Adversary Proceeding No. 04-2082-JS, this Court declared $5.1 million of the judgment to be nondischargeable.)

44. On June 20, 2003, Levitsky recorded the quitclaim deed from Jane to Contemporary among the Land Records of Anne Arundel County at Liber No. 13234, Page 177. Trustee's Exhibit No. 139.

45. At the time of all of the foregoing transactions, Contemporary's corporate charter had been forfeited. On February 19, 2004, less than one month before the petition date, Levitsky filed articles of revival on behalf of Contemporary, in response to the pending enforcement by Tega Cay of the $10 million South Carolina judgment. He revived the company charter in the name of "Contemporary Magic Kingdom, Inc.," but did not mention "CMK Company." Articles of Revival for Contemporary Magic Kingdom, Inc., filed February 20, 2004, Trustee's Exhibit 110, CIT Exhibit No. 65, M&T Exhibit No. 23.

46. Simultaneously, Levitsky attempted to register the trade name "CMK." However, because of a mark made by accident on the application, the trade name was

---

end to this abuse of the judicial process and punitive damages are available to end this misconduct." Final Order at 33-34. Judge Nicholson also found that, quite similar to leases which Dr. Levitsky produced in this case, "many of the documents presented by Dr. Levitsky in support of his position were fraudulently created and backdated."

*Id.*

21

registered as "CMK 1."  Trade Name Application for CMK 1 filed February 19, 2004 [T00202213]. Trustee's Exhibit 109; *see also* Tr. at 266:5.[17]

47.  In 2004 and again in 2005, CIT prepared to bring foreclosure proceedings against the Property.  CIT engaged Nation's Title Agency of Maryland to perform a title search.  Commitment for Title Insurance, effective date Oct. 4, 2005 (McGinnis Dep. Exhibit 2B), and Commitment for Title Insurance, effective date Oct. 4, 2005 (McGinnis Dep. Exhibit 2C), Trustee's Exhibits 129 and 130.  In both instances, the title reports listing outstanding liens on the property failed to disclose that any lien existed in favor of either FNB or M&T.

48.  On March 16, 2006, after the bankruptcy petition was filed,  Levitsky filed with SDAT a "Trade Name Amendment or Cancellation Application," which sought to retroactively change the trade name of CMK 1 to CMK.  Trade Name Amendment Application filed March 16, 2006, amending T00202213 to CMK, Trustee's Exhibit No. 115.  SDAT accepted Levitsky's statement that the "1" was a mistake, and changed the file to read "CMK."  However, Levitsky has not requested permission to use the trade name "CMK Company" from SDAT since the revival of the corporation.

-------

[17]According to the procedures and practices of SDAT, when the number '1' appears by itself in a corporate name or trade name, it is recorded by the Roman Numeral 'I.' Thus, on the SDAT records, the trade name appeared as "CMK I."

22

49.  On February 23, 2005, the Trustee's counsel, Kristin Case Lawrence, sent an email to SDAT seeking to verify to registration of the trade name "CMK Company."  On February 28, 2005, SDAT replied: "There is no record of this name on file."  On March 14, 2006, the Trustee received from SDAT a certification that "there is no record of a trade name by the name CMK Company."  Trustee's Exhibit No. 114.

50.  However, SDAT sells its records to Lexis Nexus, a search of which would have alerted the Trustee to the registration of the trade name.  M&T's Exhibit No. 22.

51.   At this time, Contemporary is not in good standing as a Maryland corporation.  SDAT Certification regarding current standing of Contemporary Magic Kingdom, Inc., Trustee's Exhibit No. 120.  The corporation has not filed a personal property tax return with SDAT for 2006, nor has it paid its 2005 personal property return filing fee.  Trustee's Exhibit No. 120.

52.  Since the inception of this case, Levitsky has been non-cooperative with the Court, the Trustee, or his creditors.  In his testimony at this trial, his answers were evasive and his behavior was obstructive.  On several occasions, he accused the Trustee of stealing his personal property and documents.  He did not appear at the hearing on Tega Cay's motion to convert his case to Chapter 7 [P. 11], later filed a motion to reconsider the conversion  [P. 167], and then appealed the denial of

23

reconsideration [P. 221]. He has not complied with reasonable requests for discovery. Tega Cay has had to file motions to compel the corporations he owns to provide a representative for Federal Rule 30(b)(6) depositions [P.157], as well as motions to compel the production of tax returns [P. 298]. At depositions held by the Trustee, he refused to answer the Trustee's questions unless they were ended with the phrase, "End of Question." When the Trustee's counsel complied, his answers remained evasive. See Exhibit C to P. 199, pp. 10-12, 14. He did not bring required documents to his deposition. *Id.*, at 15. The Trustee had to file a request for assistance by the U.S. Marshal to obtain needed documents from the debtor's house, where they were kept in approximately 60 separate boxes and trash bags. Tr. at 314:3+. The Trustee also found approximately 90 boxes of similar documents, but only because the storage facility at which they were kept called her in an effort to receive payment on an unpaid bill. Tr. at 315:14.

## *PROCEDURAL HISTORY*

1.    On March 12, 2004 ("the petition date"), Levitsky filed the instant bankruptcy case in this Court as a Chapter 13 proceeding.

2.    On June 1, 2004, the case was converted to Chapter 11 by consent order [P. 52]. The order also provided for the appointment of a Chapter 11 trustee.

24

Accordingly, by order dated July 29, 2004 [P. 91], this Court approved the appointment by the U.S. Trustee of Lori Simpson, Esquire, as Chapter 11 Trustee.

3.  By order [P. 158] entered on October 6, 2004, this Court granted the motion of a creditor, Tega Cay Properties LLC ("Tega Cay"), to convert the instant case to a Chapter 7 proceeding.  By order [P. 178] entered on October 20, 2004, Lori Simpson was appointed Chapter 7 Trustee.

4.  On September 2, 2004, the Trustee filed Adversary Proceeding No. 04-2024-JS, against Levitsky and Jane, from whom he was separated.  Complaint for Declaratory Judgment, Turnover of Property to the Estate, To Avoid and Recover Fraudulent Transfer, and to Sell Property Pursuant to 11 U.S.C. § 363.

5.  On November 29, 2004, this Court granted the Trustee a default judgment against Jane by order [P. 14].

6.  On January 31, 2005, the Trustee filed a motion for summary judgment [P. 16] against Levitsky, to which Levitsky filed an opposition [P. 17] on February 18, 2005.  This Court denied the motion by order [P. 24] entered on May 18, 2005.

7.  On March 11, 2005, M&T filed Adversary Proceeding No. 05-1254-JS against Levitsky, Contemporary, the Trustee, Associated,[18] JP Morgan, and Jane

---

[18]On April 28, 2005, M&T attempted to voluntarily dismiss Associated Enterprises from the suit and also filed an answer to the counterclaim.  However, the dismissal notice was defective and Associated remains as a party to these proceedings.

seeking a declaratory judgment that the lien of M&T on the Property was valid and that the certificate of satisfaction was void.

8.  On April 4, 2005, the Trustee filed an answer and a counterclaim against M&T, and a crossclaim against Associated and JP Morgan Chase Bank, N.A. [P. 11]. Answer to Complaint, Counterclaim by Lori Simpson against Manufacturers and Traders Trust Company to Determine Validity, Priority, and Extent of Liens, to Avoid and Recover Transfers, and for Declaratory Relief, Crossclaim to Determine Validity, Priority, and Extent of Liens, to Avoid and Recover Transfers, and for Declaratory Relief.

9.  On June 29, 2005, as successor to J. P Morgan, CIT filed an answer to M&T's complaint, a counterclaim against M&T and a cross-claim against Associated [P. 36].  Answer to Complaint of Manufacturers and Traders Trust Company, Counterclaim by CIT Group Consumer Finance Inc. against Manufacturers and Traders Trust Company, Crossclaim by CIT Group Consumer Finance Inc. against Associated Enterprises Limited.

10.  On the same date, CIT also filed an answer to the Trustee's cross-claim, as well as a counterclaim for declaratory judgment [P. 37].  Answer to Counterclaim, Answer to Crossclaim, Counterclaim by CIT Group Consumer Finance Inc. against Lori Simpson, Trustee.

26

11.  On January 20, 2006, CIT filed a motion for summary judgment [P.  76] as to the Trustee's claim or in the alternative, on its counterclaim.

12.  On January 24, 2006, M&T filed a  motion for summary judgment [P. 80].

13.  On January 24, 2006, the Trustee filed a motion for summary judgment [P. 82].

14.  On March 29, 2006, a hearing was held on the parties' cross motions for summary judgment.  All of the motions were denied by orders [P. 111, 112 and 113] entered on April 5, 2006.  The grounds for the denial of summary judgment were that issues of material fact were in dispute, including whether the Property allegedly subject to the liens was property of the bankruptcy estate (a determination of which would either endow this Court with the subject matter jurisdiction to determine the validity and priority of liens or preclude it from so doing); the effective dates of various transfers; whether Contemporary was a valid corporation having the legal capacity to take title to the Property and to encumber and/or transfer it; whether it operated under a valid trade name; and whether any of the transfers in question were fraudulent.  Transcript of March 29, 2006 Hearing, 61-2 [P. 123].

15.  On October 16, 2006, the IRS filed a motion to intervene [P. 250], which was opposed by CIT and M&T.  On October 20, 2006, the motion was granted by order [P. 260].

16.  On November 21, 2006, the Trustee filed a cross-claim [P. 272] against the IRS, to which the IRS filed an answer [P. 273] on December 4, 2006.  The IRS then filed a motion to continue the trial [P. 318], which was denied.  On February 21, 2008, the IRS filed a motion [P. 353] to be dismissed as a party from the litigation, which this Court granted by order [P.  359] on February 27, 2008.

17.  On October 20, 2006, this Court granted the Trustee's motion to set the order of proof at trial by allowing her to proceed first on her turnover complaint, and by allowing her to present her evidence that the liens of M&T and CIT were avoidable.  Order [P. 259].[19]

---

[19]The order provided, in pertinent part:

> ORDERED that the Court will first hear evidence and argument on the issue of whether the Annapolis House is property of the estate, with the order of proof as follows: (1) Trustee to present her case; (2) any party disputing that the Annapolis House is property of the estate to present its case; (3) any rebuttal; and it is further

> ORDERED that, if there is a determination that the Annapolis House is property of the estate, the Court will then hear evidence and argument on the validity and priority of liens with the order of proof as follows: (1) M&T to present its case; (2) CIT to present its case; (3) the Trustee to present [her] case; (4) any other party disputing either lien would then put on their cases; (5) any rebuttal.

Order [P. 259] dated October 20, 2006.

18.  On February 19, 2008, Levitsky filed a motion to continue the trial for approximately six months [P. 348].  The motion was denied by order [P. 350] entered on February 21, 2008.  The Court notes, however, that Levitsky essentially achieved his goal of a six-month postponement because of the time it has taken the Court to analyze the four days of trial testimony, nearly 200 exhibits, multiple deposition transcripts, and a large, divergent body of case law.

19.  Trial on both adversary proceedings was held on February 25, 26, and 28, 2008, and March 3, 2008.  On February 28, 2008, this Court ruled from the bench in Adv. Proc. No. 04-2024, that the Property was property of the debtor's bankruptcy estate.

20.  After the ruling, M&T presented its case and the Trustee presented hers, after which M&T and CIT moved for judgment.  At that point, the Court suspended the proceedings in order to consider the motions.

## *CONCLUSIONS OF LAW*

### Subject matter jurisdiction

1.  This Court has subject matter jurisdiction to determine whether the Property is included in the debtor's bankruptcy estate.  This is a core matter pursuant to 28 U.S.C. § 157(b)(2)(K).  Venue is appropriate under 28 U.S.C. § 1409.

**Property of the estate**

2.  Property of the estate includes "all legal or equitable interests of the debtor in property," "wherever located and by whomever held," "as of the commencement of the case." 11 U.S.C. § 541(a).  "This definition of estate property is broad and will reach to bring within the estate every conceivable interest that the debtor may have in property." *In re Osterwalder*, ___ B.R. ___, 2008 WL 704412 (Bankr. N.D. Ohio March 14, 2008).

3.  Assets owned by a corporation in which a debtor is a stockholder are not property of the debtor, but that of the corporation. *Kreisler v. Goldberg*, 478 F.3d 209, 214 (4th Cir. 2007) ("The fact that a parent corporation has an ownership interest in a subsidiary, however, does not give the parent any direct interest in the *assets* of the subsidiary.").  Thus, the assets of a non-debtor corporation do not become assets of the bankruptcy estate of a stockholder of the corporation, even when the individual owns all of the stock.  It is only the interest in stock held by an individual debtor in a corporation that is property of the debtor's bankruptcy estate, because it represents the debtor's equitable ownership interest in the corporation. *McCormick v. Frisch*, 199 Md. 181, 85 A.2d 793, 794 (1952) ("A share of stock of a corporation represents an aliquot portion of the net capital assets. .. . It is merely the evidence of the holder's

30

ownership of the stock and of his rights as a stockholder to the extent therein specified.").

4. In the instant case, in seeking to bring into the bankruptcy estate the debtor's residence which is titled in the name of the non-filing corporation (and which is the sole asset of the debtor's solely-owned corporation), the Trustee bears the burden of proving that the corporation is a fraud, created by the debtor to hinder, delay and defraud creditors, and that the debtor disregarded corporate formalities in using the corporation for his own personal benefit. The Trustee is not seeking to pierce the corporate veil in the usual sense of holding a stockholder individually liable for the debts of the corporation. Rather, she contends that because the debtor has fraudulently treated the corporate property as his own, reverse veil piercing permits her to administer the Property for the benefit of the debtor's creditors.

5. For purposes of determining whether any given property is an asset of the bankruptcy estate, a debtor's interest in property is determined by state law. *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (1979). Therefore, this Court must look to the law of Maryland to determine the extent of the debtor's interest in the Property held by the corporation and whether the Trustee has carried her burden of proof so that the debtor's residence may be administered as property of the estate, even though it is titled in a corporate name.

31

6.  In Maryland, "courts will pierce the corporate veil only when necessary to prevent fraud or enforce a paramount equity." *Bart Arconti & Sons, Inc. v. Ames-Ennis, Inc.*, 275 Md. 295, 310-11, 340 A.2d 225, 234 (1975), citing *Damazo v. Wahby*, 259 Md. 627, 633, 270 A.2d 814, 817 (1970); and *Gordon v. SS Vedalin*, 346 F. Supp. 1178, 1181 (D. Md. 1972).  However, in none of the cases cited was the corporate veil allowed to be pierced in order to enforce corporate debts against an individual, in the absence of proof of actual fraud.  In reversing the judgment entered against corporate insiders in *Bart Arconti*, the Maryland Court of Appeals held that the mere shifting of corporate assets from one insolvent entity to another in order to evade legal obligations did not justify holding the corporate insiders liable by veil piercing.  Likewise, in *Damazo*, the Court of Appeals reversed the trial court that held a corporate insider individually liable for commissions due a broker engaged to sell property titled in the names of two corporations.  The appeals court stated that "[t]he fact that Damazo controlled and operated the corporations would not of itself justify piercing the corporate veil or make him liable for that which the corporations owed." 270 A.2d at 817.  The court commented on the lack of evidence that Damazo "used or intended to use the corporations as instruments to perpetrate a fraud," or that he failed to observe "the separate identities of Damazo and the corporations."  *Id*.

32

Indeed, all of the corporate formalities of a business that was a going concern were followed.[20]

In *Gordon v. SS Vedalin*, the U.S. District Court for the District of Maryland (Northrop, D.J.) applying Maryland law, held that one bidding at an auction on behalf of a corporate purchaser was not individually liable for costs of resale when the corporate purchaser defaulted.  The court so held regardless of the fact that the individual had established the corporation so that he could conduct a business despite the existence of personal judgments pending against him and despite the fact that he never properly capitalized the corporation.  This was held "not enough to pierce the corporate veil," where the corporation was created in order to purchase a ship and was

---

[20]At 270 A.2d 816-17, the Court of Appeals stated:

> . . . Damazo always used a corporation to hold title to and operate a property he bought.  Both [corporations] were fully formed and legally existing corporate entities in good standing.  Although their capitalizations were small, each corporation owned substantial assets in its own right and each maintained its own financial records.  The stock of each was fully issued and separate minutes books were kept.  Damazo recognized, respected and used the corporate entities as such.  Those who dealt with Damazo knew this and knew that corporations owned the properties. The exclusive listing agreement Wahby [the broker] obtained was executed for [the corporations] expressly by Damazo as president and Wahby's subsequent agency was based on an extension of that agreement.

*Id*.

not therefore a manufacturing business that required start-up capital to operate. In addition, even though the court found that "there was significant doubt from the evidence that the legal niceties of corporate existence, such as the formal issuance of stock and corporate meetings, were regularly, if ever, observed," and that "proof of the existence of the corporation as a separate entity and not as the mere alter ego of Harold Johnson is tenuous at best," the court refused to pierce the corporate veil, stating that, "under Maryland law, the corporate entity cannot be disregarded in this case." *Gordon,* at 1181. It duly noted that articles of incorporation had been drafted by a lawyer and were filed with the SDAT. The missing elements required to pierce the veil were fraud on the part of the targeted individual or the need to protect a paramount equity. *But see Nat'l City Bank of Minneapolis v. Lapides (In re Transcolor Corp.)*, 296 B.R. 343, 369-70 (Bankr. D. Md. 2003), where this Court found fraud on the part of the individual corporate insider and imposed liability.

7. This remedy of veil piercing has been applied in Maryland when a corporation was used by its sole owner for his personal gain to defraud the creditors of the corporation. *See, e.g., Colandrea v. Colandrea,* 42 Md. App. 421, 437, 401 A.2d 480 (Md. App. 1979) (piercing corporate veil when former spouse received ownership of corporation in divorce settlement with agreement to pay other spouse

34

over time, and then transferred all assets of that corporation to a new corporation and defaulted on the payment plan).

8.  The Trustee has cited no case in Maryland where reverse veil piercing was applied to impute individual ownership to property ostensibly held by a corporation in order to satisfy the debts of the individual, and none has been found.  However, bankruptcy courts in other jurisdictions have held that when a debtor in bankruptcy treats a corporation as his alter ego, the corporate assets become part of the bankruptcy estate.  *Kendall v. Turner (In re Turner)*, 335 B.R. 140, 147 (Bankr. N.D. Cal. 2005) (in allowing judgment creditors to recover fraudulent conveyances, the court found that a corporation and limited liability company were alter egos of the debtor who created them with no business purpose and fraudulently transferred to them his residence as a means of shielding it from creditors); *Mass v. Bell Atlantic Tricon Leasing Corp. (In re Mass)*, 178 B.R. 626 (M.D. Pa. 1995); *see also Smith v. Richels (In re Richels)*, 163 B.R. 760 (Bankr. E.D. Va. 1994); *Halverson v. Schuster (In re Schuster)*, 132 B.R. 604, 612 (Bankr. D. Minn. 1991); *Hovis v. United Screen Printers, Inc., (In re Elkay Inds., Inc.)*, 167 B.R. 404, 410 (D. S. C. 1994); and *The Cadle Co. v. Brunswick Homes, LLC (In re Moore)*, 379 B.R. 284, 295 (Bankr. N.D. Tex. 2007).

35

9. The facts found in the *Turner* case are similar to those in the instant case, albeit in a different procedural context. In *Turner*, the debtor set up a Bahamian trust and a Nevada corporation in order to take title to his house. He directed the trust and the corporation to transfer the property to his wife within one year of his filing bankruptcy. The Chapter 7 trustee sought to avoid the transfer as fraudulent, with the implication that because the debtor operated the corporation as his alter ego, the house was property of the bankruptcy estate. The court found that while asset protection is not *per se* illegal, "entities may not be created with no business purpose and personal assets transferred to them with no relationship to any business purpose, simply as a means of shielding them from creditors." *Turner* at 147. In viewing the corporation and trust as the debtor's alter egos, the court disregarded it "to prevent injustice." *Id.*

10. The *Mass* case is also instructive because the procedural context is similar to that of the present case. In *Mass*, the married debtors were sole owners of a corporation supposedly engaged in the business of dry cleaning. *Mass*, at 627-28. However, the corporation observed few corporate formalities and took only one action during its existence, that of entering into an equipment lease that the debtors personally guaranteed. The court granted the trustee's complaint for turnover of money in the corporate bank account over the objection of the equipment lessor which by that time had obtained a judgment lien and garnishment against the corporate bank

36

account. *Id.* at 630. The court applied a reverse veil-piercing theory to declare that the account "rightfully belong[ed] in the debtors' estate," and concluded that the equipment lessor "should not enjoy a preferential treatment as the only business creditor to have contracted with a sham corporation." *Id.* at 630-31.

11. Other courts have held, and this Court agrees, that "that there is no logical basis upon which to distinguish between a traditional veil piercing action and an outsider reverse piercing action. In both instances, a claimant requests that a court disregard the normal protections accorded a corporate structure to prevent abuses of that structure." *C.F. Trust, Inc. v. First Flight L.P.*, 266 Va. 3, 10-11, 580 S.E.2d 806, 810 (2003), adopted by the Fourth Circuit after certification of question, 338 F.3d 316 (4th Cir. 2003), *aff'g* 140 F. Supp.2d 628 (E.D. Va. 2001); *see also Cent. Nat'l Bank & Trust Co. of Des Moines v. Wagener*, 183 N.W.2d 678, 682 (Iowa 1971) ("it cannot be accepted in this jurisdiction... that assets may be traced from a corporation to an individual but not vice versa"); *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 917, 591 P.2d 1078, 1084 (1979) ("court can find no reason in law or logic to limit the application of the alter ego doctrine..." to traditional veil piercing but not reverse veil piercing). Indeed, federal courts have implied state law recognition of reverse-veil piercing from recognition of the ability to pierce a corporate veil. *See Moore,* 379

B.R. at 289 (discussing, somewhat disapprovingly, *Zahra Spiritual Trust v. U.S.*, 910 F.2d 240, 243 (5th Cir. 1990), which made that implication).

12.  The facts of the instant case are replete with fraud on the part of the debtor and require this Court to apply the doctrine of reverse veil piercing.

A.  There is no question that Levitsky created Contemporary as a sham corporation for the sole purpose of hindering, delaying and defrauding his creditors, in particular, his former wife, Carol, by shielding the Property within a corporate shell. Finding of Fact No. 4.  For a discussion of factors constituting a sham corporation, *see Comptroller v. SYL, Inc.*, 375 Md. 78, 825 A.2d 399 (2003) (describing an out-of state holding company as a sham corporation for state taxation purposes as having "no real economic substance as [a] separate entit[y]" no full-time employees and ostensible part-time employees were actually officers and directors, and where corporate offices "were little more than mail drops." 825 A.2d at 415.     B.  Levitsky named the corporation "Contemporary Magic Kingdom," a name that had no reference to the Property or to any corporate purpose, the effect of which, the Court has determined, was to purposely mislead and confuse creditors and the general public.  He then had the corporation take title to the Property using its trade name, CMK Company, which likewise was confusing and bore no connecting reference to the Property.  Finding of Fact No. 3.

38

C.  Throughout its duration, the corporation was the debtor's alter ego and had no business purpose, kept virtually no records, had no corporate existence and received no income, other than the one and only time Levitsky allegedly paid it overdue rent for the privilege of residing in the Property.  Findings of Fact Nos. 5-9, 17-19.

D.  The corporation was dormant and defunct for long periods of time until shortly before Levitsky filed the bankruptcy petition.  Finding of Fact No. 45.  The revival of the defunct corporate charter on the eve of bankruptcy served no purpose other than to hinder, delay and defraud the debtor's personal creditors, including Carol, the IRS, and the Trustee, by shielding the Property from the efforts of his creditors to satisfy their obligations against the Property, which is his personal residence.[21]  Finding of Fact No. 5.

E.  In his sole ownership of the stock of Contemporary, Levitsky ignored corporate formalities and dealt with the Property as his own, living there virtually

---

[21]Under Maryland law, it does not matter that Carol had not obtained a final judgment at the time of the incorporation, because Levitsky's extramarital conduct rendered her a future creditor, and Levitsky had actual intent to defraud her.  Under such circumstances, Levitsky's transactions were fraudulent.  *See* Md. Comm. Law Code § 15-207 ("Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud present or future creditors, is fraudulent as to both present and future creditors.").

39

rent-free for much of its 25-year ostensible ownership of the Property.  Findings of Fact Nos. 1 and 5.  The Court notes that, assuming the debtor resided on the Property subject to a valid lease, which is questionable under the circumstances, such a lease was rejected as a matter of law by the debtor's failure to assume it, pursuant to Section 365 of the Bankruptcy Code.

F.  Other than the Property, Contemporary possessed no other assets.  Finding of Fact No. 4.

G.  Levitsky used the Property titled in the name of corporation to obtain personal loans and used the borrowed money for non-corporate purposes, based upon the equity of the corporation in the Property.  In addition, he laundered the money for his personal benefit and to avoid the payment of taxes through offshore shell corporations that he created and controlled and even sheltered from his creditors the ostensible rental payment of more than $30,000 that Levitsky transferred to the corporation shortly before bankruptcy, thus defrauding his personal creditors. Findings of Fact Nos. 28-36.

H.  The debtor's fraudulent intent may be inferred from his causing the corporation to transfer the Property to Jane for no consideration by an unrecorded deed at a time when he owed money to his former wife, Carol and to Tega Cay. Findings of Fact Nos. 4 and 32.

40

I.  In short, the Property is in actuality property of the debtor's estate because he has treated the Property as his own throughout the time that it was titled in the corporate trade name and because he has used the sham corporation to hinder, delay and defraud his creditors.

13.  In the instant case, the application of reverse veil-piercing will not prejudice creditors of the corporation.  *See Moore*, 379 B.R. at 295*, Stoebner v. Lingenfelter*, 115 F.3d 576, 579-80 (8th Cir. 1997) (reverse piercing only appropriate when none of corporation's creditors will be prejudiced).  CIT and M&T are the only creditors of Contemporary, other than possibly Levitsky himself.  Both have purported liens on the Property, which are equally valid or invalid inside or outside of bankruptcy.  Thus, the disregard of Contemporary as a corporate entity and the treatment of the Property as property of the bankruptcy estate will have no adverse impact on or cause prejudice to either CIT or M&T.[22]

14.  Having determined that the Property is property of the estate, this Court has subject matter jurisdiction under 26 U.S.C. § 1334 to require its turnover by the debtor to the Trustee, and also to determine the priority of the liens of M&T and CIT as to the Property.

---

[22] In light of the parties' apparent agreement that the Property is worth well over one million dollars, CIT's interest will also be protected assuming that the Trustee accedes to M&T's alleged first lien position.

15.  CIT and M&T are precluded by the doctrine of collateral estoppel from rearguing that the Property is not property of the estate, having argued and lost on the issue.  *See Colandrea v. Wilde Lake Cmty. Ass'n, Inc.*, 361 Md. 371, 761 A.2d 899, 908 ("If a proceeding between parties does not involve the same cause of action as a previous proceeding between the same parties, the principle of collateral estoppel applies, and only those facts or issues actually litigated in the previous action are conclusive in the subsequent proceeding... When the principle of collateral estoppel applies, facts or issues decided in the previous action are conclusive only if identical to facts or issues presented in the subsequent proceeding.").

16. Although not argued by the Trustee as grounds for relief, the Court notes the following alternative grounds that might have been claimed to authorize the Chapter 7 Trustee to take possession of the Property.

A.  The first of these is found in the case of *In re Bonham*, 226 B.R. 56 (Bankr. D. Ala. 1998), where the bankruptcy court granted a trustee's motion to substantively consolidate the Chapter 7 debtor's estate with her closely-held, non-filing corporations that had been used to defraud creditors in a Ponzi-type scheme.  Quoting J. Stephen Gilbert, *Substantive Consolidation in Bankruptcy: A Primer*, 43 VAND. L. REV. 207, 218, the court differentiated substantive consolidation from the similar result obtained under state law alter ego doctrines by stating:

42

> ... Substantive consolidation more closely resembles the bankruptcy rule of subordination because competition for the consolidated assets is between creditors alone. Thus, substantive consolidation ignores artificial legal structures but looks only to the combined assets of the consolidated entities for satisfaction of all claims against the collective group.

*Bonham*, 226 B.R. at 77. *Contra, Maiz v. Virani*, 311 F.3d 334, 343-45 (5th Cir. 2002) (turnover proceeding may not be used to adjudicate whether a corporation is an individual judgment debtor's alter ego); and *Morse Operations, Inc. v. Robins LeCoq, Inc. (In re Lease-A-Fleet)*, 141 B.R. 869 (Bankr. E.D. Pa. 1992) (involuntary consolidation of debtor's case with that of non-debtor corporation was not appropriate in the absence of extraordinary circumstances).

B. A second case in which a Chapter 7 trustee obtained possession of a debtor's corporate property without piercing the corporate veil is *Fowler v. Shadel*, 400 F.3d 1016 (7th Cir. 2005). In that case, the Seventh Circuit held that where, as here, the debtor who was the sole shareholder of a corporation failed to exempt his interest in the corporate stock, the trustee acceded to the debtor's interest in the stock and therefore had the right to liquidate the assets of the corporation, even though the corporate assets themselves (in that case, trucks) were not property of the debtor's bankruptcy estate. 400 F.3d at 1018-19.

43

**The Priority and/or Avoidance of the Liens of M&T and CIT**

17.  The liens of M&T and CIT are not invalid on the ground that the 1983 deed from the Magnolia Way Joint Venture did not effectively convey good title of the Property to Contemporary.  The Trustee's assertion to the contrary is based upon the deed's recitation that the Property was being conveyed to "CMK Company, a Maryland Corporation," at a time when there was no such corporation or trade name recorded among the land records.  However, it must be  remembered that the trade name of "CMK Company" *was* recorded in the land records on September 29, 1983, 22 days after the deed was executed and 21 years before the petition date. While the failure to record a deed might have resulted in its invalidation during the period between execution and recordation, Maryland courts have not invalidated deeds when such a mistake in corporate formalities is later corrected.  *See, e.g., Zulver Realty Co. v. Snyder*, 191 Md. 374, 379, 62 A.2d 276, 279 (holding that deed was valid when the deed was conveyed to grantee corporation which formally incorporated after the conveyance).  In light of the brief period between the execution of the deed and the proper recordation of the trade name, and the long duration between the recordation of the trade name and the filing of the bankruptcy petition, the liens may not be invalidated  based on the late-filing of the trade name.

44

18.  The liens of M&T and CIT are not invalid on the ground that the corporate charter of Contemporary Magic Kingdom, Inc., had been forfeited for almost seven years when FNB made the loan to "CMK Company."  While it is true that Bank One made its loan at a time when the charter had been forfeited for nearly a decade, courts have employed concepts of estoppel to prevent a bankruptcy trustee from using her strong-arm powers to void a lien obtained in the name of a corporation whose charter was forfeited.  *See Exchange Nat'l Bank v. A. J. Rackers, Inc. (In re A. J. Rackers, Inc.)*, 167 B.R. 168, 175-76 (Bankr. W.D. Mo. 1994); *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432 (7th Cir. 1980) (interpreting the Bankruptcy Act).  In *A. J. Rackers*, a bank made a secured loan to a corporation approximately one month after its charter had been forfeited without knowledge of the forfeiture by either party. *Rackers,* at 170.  Subsequently, without having its charter reinstated, the corporation operated its heating and air conditioning repair and installation business for the next seven months before it closed its doors and wound down its affairs.  Although the court found that the activities of a business which has forfeited its corporate charter are limited to winding down the operation, it held the loan to be valid because the corporation was a "corporation by estoppel."  Despite the proposition that, "as a general rule, the trustee is not bound by estoppel," the court was persuaded that under

45

the Uniform Commercial Code, there was proper attachment by estoppel that the trustee could not overcome. *Id.* at 175.

19.   Like Missouri, Maryland recognizes the concept of "corporation by estoppel." *See Cranson v. Int'l Bus. Mach. Corp.*, 234 Md. 477, 487, 200 A.2d 33, 38 (1964) (to prevent creditor from pursuing claim against president of corporation personally when creditor had dealt with the corporation as though it were a corporation even though it had failed to incorporate). Accordingly, had Levitsky not personally guaranteed the loans in question, and assuming that M&T and CIT for some reason could not pierce the corporate veil, both would be estopped from denying the existence of Contemporary and from pursuing their claims against Levitsky personally.

20.  Finding persuasive the reasoning in *Rackers* and *Pubs*, this Court holds that while a trustee is not estopped from challenging the perfection of a lien by estoppel, a trustee is estopped from challenging the attachment of a security interest, when that attachment occurred through estoppel. *Rackers,* at 175.

21.  The Court also notes that in this case, unlike *Rackers*, the corporate charter was revived by the time the bankruptcy petition was filed.  While the circumstances surrounding that corporate revival are suspicious, (having been revived one month prior to the filing of the petition after more than a decade of dormancy), there is no

46

evidence that the revival was ineffective, at least with regard to the corporate name.

22. Pursuant to Section 544(a)(3),[23] a Chapter 7 trustee possesses all of the lien avoidance powers that would be bestowed by state law upon a hypothetical purchaser of property who purchased the property on the date the bankruptcy petition was filed. *See* 11 U.S.C. § 544(a)(3); *Rinn v. First Union Nat. Bank of Md.*, 176 B.R. 401, 25 UCC Rep. Serv.2d 1057 (D. Md. 1995). This Court (Derby, J.) has previously

---

[23]Section 544(a) provides, as follows:

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by–

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

11 U.S.C. § 544(a).

invalidated a lien on the personal property of a corporation when the allegedly secured party filed a financing statement that referred to the debtor by its trade name. *Greenbelt Coop., Inc. v. Werres Corp. (In re Greenbelt Coop.)*, 124 B.R. 465, 470 (Bankr. D. Md. 1991) (citing *In re Bumper Sales, Inc.*, 907 F.2d 1430 (4th Cir. 1990)); *see also* Lawrence Bach, *Trade Name Filing: Should It be Sufficient to Perfect A Security Interest Under U.C.C. Section 9-402?*, 35 CASE W. RES. L. REV 51 (1985). As noted, that case dealt with personal and not real property, and was decided based upon provisions of the Uniform Commercial Code.[24]

23.   In order to properly distinguish *Greenbelt Coop.,* it is necessary to briefly describe the history of the methods by which Maryland allows corporations to record trade names.  Before 1991, the law required that trade names be filed in every county in which the trade name was used.  Upon filing, the clerks of court forwarded the trade names to SDAT, which maintained a trade name master list.  The filing of a trade

---

[24]In *Greenbelt Coop.*, the debtor corporation operated a furniture store known to consumers as SCAN or SCAN Furniture, but was incorporated under the name "Greenbelt Cooperative, Inc." *Id.* at 467.  An equipment lessor entered into what was effectively a purchase-money loan for forklifts with the corporation, but filed a financing statement under the name Scan Furniture.  Judge Derby granted the complaint brought by the debtor-in-possession to avoid the lessor's lien on the forklifts and held that because the trade name "SCAN Furniture" was not remotely similar to the corporate name "Greenbelt Cooperative, Inc.," the debtor-in-possession could use the trustee's strong-arm powers under 11 U.S.C. § 544(a)(1) to avoid the lien. *Id.* at 471.

name gave the corporation the right to use the trade name forever, but not the exclusive right. In 1991, the General Assembly enacted important revisions to the law that became effective on July 1, 1991. First, trade names were required to be filed with SDAT, and were given statewide effect. Second, once registered properly, trade names were to be exclusive, that is, no one but the filer was allowed to use them. Third, trade names were to last for only 10 years, instead of in perpetuity.

24. The current statute governing the recordation of trade names is found in Sections 1-401 through 1-415 of the Business Regulation Article of the Maryland Code. The following quoted sections are relevant to the instant case:

**1-401. Definitions.**

(c) *Mark.* "Mark" means a name, symbol, word, or combination of 2 or more of these that a person:

(1) places on goods that the person sells or distributes, a container of the goods, a display associated with the goods, or a label or tag affixed to the goods to identify those goods that the person makes or sells and to distinguish them from goods that another person makes or sells; or

(2) displays or otherwise uses to advertise or sell services that the person performs to identify those services that the person performs and to distinguish them from services that another person performs.

        *           *           *           *           *

1-401(f) *Trade name.* – "Trade name" means a name, symbol, word, or combination of 2 or more of these that a person uses to identify the business or occupation of the person and to distinguish it from the business or occupation of another person.

## 1-402.  Effect of Subtitle.

This subtitle does not affect adversely a right or the enforcement of a right in a mark acquired in good faith at any time at common law.

## 1-403.  Records.

The Secretary of State shall keep a public record of the marks registered under this subtitle.

## 1-404.  Registration authorized.

(a) *In general.* –  If a person uses a mark in the State, the person may register the mark in accordance with this subtitle.

(b) *Exceptions.* –  A person may not register a mark that:

\*          \*          \*          \*          \*

(5) is likely, when applied to the goods or services of the person, to confuse or deceive because the mark resembles:

(i) another mark registered in the State; or

(ii) a mark or trade name that another person has used in the State and has not abandoned.

(d) *Registration of trade name prohibited.* –  A person may not register a trade name that is not a mark.

**1-410.  Term and renewal of registration.**

(a) *Term of registration.* – Unless registration of a mark is renewed for a 10-year term as provided in this section, the registration expires on the tenth anniversary of its effective date.

**1-412.  Cancellation of registration.**

(a) The Secretary of State shall cancel a registration of a mark if:

(1) the registrant asks that it be canceled;

(2) the registrant fails to renew it;

(3) a court of competent jurisdiction orders that it be canceled on any ground; or

(4) a court of competent jurisdiction finds that:

(i) the mark is abandoned;

(ii) the registrant does not own the mark;

(iii) the registration was granted improperly; or

(iv) the registration was obtained fraudulently.

*Id.*[25]

---

[25]The status of prior recorded trade names is ambiguous under the new law, and SDAT was uncertain how to treat them.  For a period, it maintained the trade names filed after the 1991 change in the same file as those filed before it.  However, because the primary purpose for searching trade name records is to determine whether a name has already been registered, and because the pre-1991 trade names were non-exclusive (and arguably lasted forever), SDAT decided that it would no longer be worthwhile to keep the pre-1991 records open to the public.  Accordingly, it removed the pre-1991 trade name files from the records open to the public, although SDAT

25.   The holding in *Greenbelt Coop.* is not applicable here, not only because the instant case deals with real property, but because the facts of the instant case differ from *Greenbelt Coop.* in two ways.  First, *Greenbelt Coop.* was decided before the 1991 change in the Maryland trade name recordation law, and there was no finding that the trade name "SCAN Furniture" had been filed with the clerks of the circuit courts in the counties in which the forklifts were located.  In the instant case, "CMK Company" was ultimately recorded properly as a trade name.  Second, in the instant case, a hypothetical purchaser would have knowledge of the trade name "CMK

---

employees continued to have access to them.  The records are now available only on microfilm.  They are not viewable either in an online search of the SDAT database nor if a party went to the SDAT counter in person.  Online search capabilities of SDAT allow a party to access any trade name by search using its initial letters followed by a percentage sign.  For example, one could search for all trade names beginning with the letters CMK, by searching for CMK%.  However, an online search for CMK% would not yield CMK Company because that trade name was filed before 1991.  A party may also search online for all of the trade names of a Maryland-registered corporation by its "Department ID number."  However, once again, such a search would not disclose any trade name registered before 1991.  The website does not inform one that it will not permit access to trade names filed before 1991.  In order to compel SDAT to produce the old trade names, a party must appear in person at the office of SDAT and  request a clerk to search the microfilm records for a specific trade name.  Due to a lack of institutional memory, there is a good chance that most SDAT clerks are unaware of the existence of the old trade name files.  Thus, there is no method by which the Trustee could obtain the trade name, CMK Company from SDAT without specifically asking a knowledgeable clerk to search the microfilm records.  However, a search of the Lexis-Nexus database, which is available to private parties for a fee, would have revealed the existence of the old trade names.

Company," because that was the name used on all the deeds in the chain of title as far back as 1983.

26.  Maryland courts have been unforgiving of a purchaser's mistake of law. *See Cooke's Lessee v. Kell*, 13 Md. 469, 493, 1859 WL 3857 at *16 (Md. 1859) ("If registration laws do not give notice to the community which will bind it, then they are of no use whatever..."); *see also Janusz v. Gilliam*, 404 Md. 524, 536, 947 A.2d 560, 567 (May 9, 2008), *quoting  Hoffman v. Chapman,* 34 A.2d 438, 441, 182 Md. 208, 213 (1943) ( "[t]he general rule is accepted in Maryland that a mistake of law in the making of an agreement is not a ground for reformation...").  The system of recording trade names employed by SDAT comports with the law of Maryland. Accordingly, a purchaser of a home in Maryland is charged with knowledge of the recording system of the jurisdiction in which she is purchasing a home, including the system of recording trade names, if for some reason the home is titled in a trade name.

27.  When conducting a title search, a purchaser is obligated to look back as far as is reasonable under the circumstances.  *Coe v. Hays*, 105 Md. App. 778, 786, 661 A.2d 220, 224 (1995) (finding that, based on expert testimony, a title search going back 99 years was sufficient and that 60 years would have also been sufficient to convey marketable title).

28.   From the deeds in the chain of title to the Property, a hypothetical purchaser would realize that there was a deed to "CMK Company" which existed as far back as 1983.   Accordingly, a hypothetical purchaser would be on notice that it would be necessary to search the pre-1991 trade name records to find that trade name.

29.   The Trustee cites the recent opinion the Maryland Court of Appeals for the proposition that the burden of risk of a clerk's mistake is on the party recording, not on the purchaser. *See Greenpoint Mortgage Funding, Inc. v. Schlossberg*, 390 Md. 211, 234-35, 888 A.2d 297, 311 (2005) ("Indexing mistakes should be at the risk of the person who had the ability to insure that the document was indexed correctly – the filer."). Here, unlike Greenpoint Mortgage, the trade name CMK Company was properly recorded in the Anne Arundel County Circuit Court under the laws in existence at the time of recordation.  SDAT may have provided an incorrect answer to the Trustee's question when it advised her that no such trade as "CMK Company" existed; but the Trustee asked the wrong question.  As a hypothetical purchaser, the Trustee is charged not only with knowledge of the recording laws, but also with the knowledge of the recording practices of SDAT.  Those practices apparently include not informing inquirers about trade names registered before July 1, 1991, unless the inquirer specifically asks for them.

30.  For these reasons, the Trustee cannot use her § 544(a)(3) powers  to avoid the lien of CIT on the theory that a hypothetical purchaser would not have notice of the trade name "CMK Company."

31.  Maryland is a race-notice jurisdiction.  *See* Md. Real Prop. Code Ann. § 3-203.[26]  Accordingly, when a grantor conveys a deed or deed of trust to one purchaser or lender, and then subsequently conveys a deed or deed of trust on the same property to another purchaser or lender who takes without notice of the first deed or deed of trust, the first purchaser or lender who properly records its interest in the land records will defeat the other purchaser or lender's interest.

32.  While it is true that Jane conveyed her interest in the Property back to Contemporary before Bank One recorded its deed of trust, Contemporary also delayed recording the transfer to Jane.  Because it delayed recording the reconveyance,

---

[26]Section 3-203 of the Real Property Article of the Maryland Code provides as follows:

>    Every recorded deed or other instrument takes effect from its effective date as against the grantee of any deed executed and delivered subsequent to the effective date, unless the grantee of the subsequent deed has: (1) Accepted delivery of the deed or other instrument: (i) In good faith; (ii) Without constructive notice under § 3-202; and (iii) For a good and valuable consideration; and (2) Recorded the deed first.

Md. Real Prop. Code Ann. § 3-203.

Contemporary would not have been able to defeat Bank One's unrecorded deed of trust, even had it taken back the Property without knowledge of the deed of trust. Of course it did not, because Bank One recorded its deed of trust before Contemporary recorded the deed. Therefore, a hypothetical purchaser analyzing the chain of title to the Property would have had notice of this entire series of events.

33.   The Trustee argued that the Replacement Deed of Trust between Jane and Bank One was actually a new deed of trust that Jane did not have authority to execute because she had already transferred the Property back to Contemporary. This Court disagrees, and so do the Maryland cases that have held replacement deeds to be valid. *See, e.g., Bugg v. Md. Transp. Auth.*, 31 Md. App. 622, 358 A.2d 562, 586 (1976). Generally, courts will only invalidate a replacement deed when there is some indicia of fraud. *See, e.g., RKB Investments v. Maxfield ( In re B.L. Jennings, Inc.)*, 373 B.R. 742 (Bankr. M.D. Fla. 2007). While there are plenty of indicia of fraud present in this case, the Replacement Deed of Trust itself has none of these; rather, it was executed and recorded to replace the original deed of trust rejected by SDAT because it mistakenly purported to be a refinancing deed of trust. The addition of the words "Purchase Money" on the top of the Replacement Deed of Trust corrected that error and served to effectuate the intent of all parties to the original deed of trust. Accordingly, because the Replacement Deed of Trust properly replaced the original

56

deed of trust, it therefore relates back in time to the date of the deed of trust it replaced. There might be a different result if the deed from Jane to Contemporary was recorded prior to the recordation of the replacement deed of trust.

34. Nevertheless, even were the Replacement Deed of Trust in fact a new deed of trust, it is still effective even if Jane had no authority to convey it, because it was recorded by Bank One before Contemporary recorded the deed from Jane. As a race-notice jurisdiction, Maryland law holds that when the owner of real property conveys a deed to one party and later a deed of trust to a different party, the first party takes the property subject to the deed of trust if the holder of the deed of trust records first. Thus, assuming the Replacement Deed of Trust was in fact a new deed of trust, it is still effective because Bank One obtained it without knowledge of the deed back to Contemporary, and Bank One recorded first. Md. Code Ann., Real Prop § 3-203. Therefore, the trustee's argument that the Replacement Deed destroyed the lien of CIT fails.

35. The Trustee also seeks to use her Section 544(a)(3) hypothetical purchaser powers to prevent M&T from asserting a lien on the Property, on the theory that a hypothetical purchaser would have had no inquiry notice that the certificate of satisfaction of M&T's lien had been either fraudulently or mistakenly recorded. It is black letter law that a certificate of satisfaction recorded by mistake does not release

57

a mortgagee from a lien or from the obligations that the lien secures. Numerous state court opinions have held in cases where a certificate of satisfaction was fraudulently entered onto the land records, the lien survived, even against an innocent purchaser. *See, e.g., Leedom v. Spano*, 436 Pa. Super. 18, 34, 647 A.2d 221, 229 (1994) (innocent purchasers took property subject to lien even though fraudulent lien release was filed by unidentified individual in land records); *Sunrise Sav. & Loan Ass'n of Fla. v. Giannetti*, 524 So. 2d 697, 700 (Fla. Dist. Ct. App. 1988) ("where a mortgage has been cancelled because of the fraudulent conduct of an intervening third party, without authority or consent of the mortgagee, the result is [that the mortgagee's lien survives]") (citing *Zimmer v. Fryer*, 190 La. 814, 183 So. 166 (1938)); *Luther v. Clay*, 100 Ga. 236, 248, 28 S.E. 46, 49-50 (1897) (bona fide purchaser took real property subject to lien on which certificate of satisfaction had been fraudulently filed by mortgagor); *Keeler v. Hannah*, 52 Mich. 535, 536, 18 N.W. 346, 346 (1884) (original mortgagee's lien was effective against subsequent mortgagee even though mortgagor had filed fraudulent release of first mortgage and subsequent mortgagee had no knowledge of fraud); *Crecelius v. Home Heights Co.*, 217 S.W. 508, 512 (Mo. 1919) (deed of trust fraudulently released by third party was still effective against bona fide purchaser); *Scardone v. Sozzi*, 108 N.J. Eq. 415, 155 A. 376 (N.J. Ch. 1931) ("Between a mortgagee whose mortgage has been discharged of record solely through

the unauthorized act of another party, and a purchaser who buys the title in the belief, induced by such cancellation, that the mortgage is satisfied and discharged, the equities are balanced, and the rights in the order of time must prevail") (citations omitted).[27]  The only exception is where the certificate of satisfaction was mistakenly recorded because of the lienholder's own negligence.  One bankruptcy opinion went so far as to hold that anytime a certificate of satisfaction is mistakenly recorded due to anyone's fault other than that of the affected lienholder, the lien is still effective even against a bona fide purchaser.  *See Home Sav. & Loan. Co. v. O'Reilly (In re O'Reilly)*, 30 B.R. 562, 564 (Bankr. N.D. Ohio 1983).  Indeed, when the mistaken release of a lien was entirely due to the fault of the holder of the released lien, one bankruptcy court allowed § 544(a)(3) to avoid the lien.  *See Collins v. Bank of New England-West, N.A. (In re Daylight Dairy Prods., Inc.)*, 125 B.R. 1, 4-5 (Bankr. D. Mass. 1991) (allowing trustee to use §544(a)(3) where bank had mistakenly recorded a certificate of satisfaction of its own lien).

36.    However, under Maryland law, a properly-recorded certificate of satisfaction acts to release property from any lien contained thereon.  Md. Real Prop.

---

[27]An exhaustive list of similar decisions is contained at 35 A.L.R.2d 948 (1951 & Supp. 2002).

Code Ann. § 7-103(a).[28]  Two Maryland decisions, seemingly unique in the nation,

hold that when one purchases property without notice that a certificate of satisfaction

was mistakenly recorded, the purchaser takes the property free and clear of any lien

that was mistakenly released.  *Van Schaik v. Van Schaik*, 35 Md. App. 19, 26, 369

A.2d 133, 137 (1977)  ("[I]f a release of mortgage is mistakenly recorded, that release

is effective as to subsequent bona fide purchasers...");[29] and *Bond v. Dorsey*, 65 Md.

---

[28]Section 7-103(a) of the Real Property Article of the Maryland Code provides as
follows:

> The title to any promissory note, other instrument, or debt secured
> by a mortgage, both before and after the maturity of the note, other
> instrument, or debt, conclusively is presumed to be vested in the person
> holding the record title to the mortgage. If the mortgage is duly released
> of record, the promissory note, other instrument, or debt secured by the
> mortgage, both before and after the maturity of the promissory note,
> other instrument, or debt, conclusively is presumed to be paid as far as
> any lien on the property granted by the mortgage is concerned.

Md. Real Prop. Code Ann., § 7-103(a).

[29]In *Van Schaik*, owners of real property sold it to their son and daughter-in-law,
subject to a purchase-money mortgage which they sold to a third-party bank.  The
bank later attempted to reassign the mortgage back to the original owners, but instead
mistakenly released the mortgage.  The son and daughter-in-law sold part of the real
property to a third party who had no notice that the release had been mistakenly
recorded.  When one of the original owners (the other had since died) discovered the
release, she filed a bill of complaint seeking to vacate the release.  In affirming the
trial court's grant of the vacatur of the release as to the son and daughter-in-law, the
Court of Special Appeals of Maryland also held that the released mortgage did not
apply to the land that was sold to the bona fide purchaser. 35 Md. App. at 26-27, 369
A.2d at 137-39.  Thus, the decision held, in disagreement with every other state that

310, 316, 4 A. 279, 281 (1886) ("Of course, the mortgage cannot be restored as against one who has in good faith purchased the property after the cancellation, or has advanced money upon it upon the faith of a clear record title"). These opinions permit a bona fide purchaser to take title to real property free and clear of a lien mistakenly released as a result of a third party's negligence. Accordingly, even though the lien of M&T was allegedly released as a result of the negligence of a third-party, under the authority of the cases cited, the Trustee is empowered to avoid the lien of M&T for the reason that a bona fide purchaser could do so in Maryland.

37. M&T argued that a hypothetical purchaser would be put on inquiry notice that the certificate of satisfaction was mistakenly recorded, in support of which M&T noted that the certificate was signed by Levitsky, and not by an employee or agent of M&T. This Court disagrees. In order to be precluded from the status of a bona fide purchaser, there must be "circumstances which ought to have put a person of ordinary prudence on inquiry," in which case a purchaser "will be presumed to have made such inquiry and will be charged with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Fertitta v. Bay Shore Dev. Corp.*, 266 Md. 59, 72, 291 A.2d 662, 669 (1972). M&T asserted that

---

has decided the issue, that even though the original lienholder's lien was mistakenly released by a third party, the lien was ineffective as to a bona fide purchaser.

while the certificate of satisfaction did not disclose the status of Levitsky as president and/or sole shareholder of Contemporary/CMK Company, his status was readily ascertainable based on four different documents recorded in the Land Records of Anne Arundel County, including the deed of trust between Levitsky and FNB as referenced by the certificate, which the certificate purportedly released. On the other hand, the Trustee argued that a hypothetical purchaser would not be on notice that the certificate was fraudulently or mistakenly recorded. In so arguing, the Trustee relies on the two title searches conducted by title agencies employed by CIT that certified that there were no mortgages recorded on the Property, other than that of CIT. The Trustee also argued that a hypothetical purchaser would have had no reason to believe that FNB had not assigned the deed of trust to Levitsky after he had fully paid the mortgage. The Trustee noted that the certificate was certified as properly executed by a Maryland attorney, Mark Reges, whose signature is notarized.

38. Subsection (b) of Section 3-105 of the Maryland Real Property Code, which governs the release of deeds of trust, mortgages or liens, authorizes the assignee of a lien to record a certificate of satisfaction without the necessity of recording the actual assignment of the lien.[30] Therefore, a reasonable title searcher could believe

---

[30]Section 3-105(b) provides, as follows:

(b) A release may be endorsed on the original mortgage or deed

62

that M&T assigned its deed of trust to Levitsky, who released it as the assignee, as the two CIT title searchers apparently believed. A title searcher would note that the certificate of satisfaction was signed and certified by a member of the Maryland bar experienced in real estate transactional law. Additionally, the existence of later loans accompanied by the certificate of satisfaction of the M&T lien would indicate to a prudent title searcher that the loan had been paid off by the CIT loan. Accordingly, the Court disagrees with M&T's contention that a hypothetical purchaser would have inquiry notice that M&T's loan had not been paid off.

---

of trust by the mortgagee or his assignee, the trustee or his successor under a deed of trust, or by the holder of the debt or obligation secured by the deed of trust. The mortgage or the deed of trust, with the endorsed release, then shall be filed in the office in which the mortgage or deed of trust is recorded. The clerk shall record the release photographically, with an attachment or rider affixed to it containing the names of the parties as they appear on the original mortgage or deed of trust, together with a reference to the book and page number where the mortgage or deed of trust is recorded. When the mortgage or deed of trust, with the attached release, is filed for the purpose of recording the release, the clerk shall retain the mortgage or deed of trust in his office and not permit it to be withdrawn for 25 years, after which time he may destroy it. If, however, the clerk preserves a photographic copy of the release, he may permit the original mortgage or deed of trust with the release to be withdrawn.

*Id.*

63

39.  In response to the argument of M&T that, despite the release, it retains an equitable lien, courts have repeatedly refused to enforce equitable liens against the powers of a hypothetical purchaser accorded to a bankruptcy trustee by Section 544(a)(3).  *See, e.g., Barclays American/Mortgage Corp. v. Wilkinson (In re Wilkinson)*, 186 B.R. 186 (Bankr. D. Md. 1995) (Keir, J.) (Defect in execution of mortgage barred lender from asserting an equitable lien against a Chapter 13 debtor in possession); *Wolf v. Mahrdt ( In re Chenich)*, 100 B.R. 512, 515 (9th Cir. BAP 1987) (hypothetical bona fide purchaser "takes title to the real property free from all equitable liens") (quotations omitted).  Indeed, the only equitable liens enforced in the context of Section 544(a)(3) are those of a first-in-time lender against a second-in-time lender.  *See, e.g., In re Price*, 97 B.R. 264, 266 (Bankr. E.D. N.C. 1989) (substituting trustee in place of first lender and allowing trustee to occupy first lien position); *First Am. Nat'l Bank v. Miller (In re Miller)*, 286 B.R. 334, 343-44 (Bankr. E.D. Tenn. 1999) (same).  Similarly, if it is found that an agent of CIT negligently released the lien of M&T, M&T may have an equitable lien on the proceeds of CIT's lien, under a theory of unjust enrichment.  However, such a claim was not a part of M&T's motion for judgment and therefore it is not appropriate to rule on it now.

40.  By avoiding the lien of M&T, which was recorded prior to that of CIT, the Trustee succeeds to the former lien position of M&T, ahead of that of CIT.

**Standard of review**

41.  The Court will grant CIT's motion for judgment and deny that of M&T. Judgment as a matter of law is appropriate when, "without weighing the credibility of witnesses, there can be but one reasonable conclusion as to the correct judgment ... If, however, evidence viewed in a light most favorable to the nonmovant indicates that more than one conclusion is plausible, judgment as a matter of law is improper."  *In re Byrd Foods, Inc.*, 253 B.R. 196, 199 (E.D. Va. 2000), citing *Siegfried Construction, Inc. v. Gulf Ins. Co.*, 203 F.3d 822 (4th Cir. 2000)(table) (unpublished).  *See* Federal Rule of Civil Procedure 52(c), made applicable herein by Federal Bankruptcy Rule 7052.  The Court will grant CIT's motion, because weighing all of the evidence in favor of the Trustee, the Court finds that a conclusion in the Trustee's favor is implausible.  Because a decision in favor of M&T is implausible, and because M&T has stated that it does have any further evidence to present, the Court will enter judgment against M&T, thereby allowing the Trustee to avoid its lien against the Property.

WHEREFORE, in  Adversary Proceeding No. 04-2024, this Court will enter a decree in favor of the Trustee declaring that the Property is includable as property of the debtor's estate, and will require that the debtor turn over the said Property to the Trustee forthwith.  In Adversary Proceeding No. 05-1254, this Court will declare that

the lien of M&T is avoidable by the Trustee, who will take priority over the recorded lien of CIT; and that the Trustee will be authorized to sell the Property for the benefit of the general unsecured creditors of the bankruptcy estate of Leon R. Levitsky, including M&T, subject to the prior lien of CIT.

*ORDER ACCORDINGLY.*

cc:    Leon R. Levitsky
       1315 Magnolia Avenue
       Annapolis, Maryland  21403
       Debtor

       Cynthia L. Leppert, Esquire
       Jennifer J. Karangelen, Esquire
       Neuberger, Quinn, Gielen, Rubin & Gibber
       One South Street, 27th Floor
       Baltimore, Maryland  21202-3282
       Counsel to the Chapter 7 Trustee

       Lori S. Simpson, Esquire
       Bishop, Daneman & Simpson, LLC
       2 North Charles Street, Suite 500
       Baltimore, Maryland  21201
       Chapter 7 Trustee

       Harvey A. Levin, Esquire
       Thompson Coburn LLP
       1909 K Street, N.W., Suite 600
       Washington, D.C.  20006
       Counsel to CIT Group Consumer Finance Inc.

       Michael Scott Cohen, Esquire
       213 Washington Street
       Cumberland, Maryland  21502
       Counsel to Manufacturers and Traders Trust Company

       Ms. Jane Lambert
       2611 Aspen Springs Drive
       Park City, Utah  84060

       Dashiell C. Shapiro, Esquire
       555 Fourth Street NW
       Department of Justice, Tax Division
       Washington, DC 20001

United States of America (IRS)
c/o Jennifer L. Vozne
U.S. Department of Justice
PO Box 227
Washington, D.C.  20044

Office of the United States Trustee
2625 U.S. Courthouse
101 West Lombard Street
Baltimore, Maryland   21201